1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**
10     **CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION**
11

RONALD L. SHAW,                    )     Case No. CV 14-07740-RGK (AS)
                                   )
            Plaintiff,             )     **FINAL REPORT AND**
                                   )
      v.                           )     **RECOMMENDATION OF A UNITED**
                                   )
CAROLYN W. COLVIN, Acting          )     **STATES MAGISTRATE JUDGE**
Commissioner of Social             )
Security,                          )
                                   )
            Defendant.             )
_____)

        This Final Report and Recommendation[1] is submitted to the Honorable

R. Gary Klausner, United States District Judge Pursuant to 28 U.S.C. §

636 and General Order 05-07 of the United States District Court for the

Central District of California.  For the reasons discussed below, it is

recommended that, pursuant to Sentence Four of 42 U.S.C. § 405(g), this

matter be remanded for further administrative action consistent with

this Amended Report and Recommendation.

_____

        [1] This Final Report and Recommendation includes the dates on which
the Court issued its Reports and Recommendations and the dates on which
Defendant filed objections (see page 2) and is otherwise identical to
the Amended Report and Recommendation dated March 15, 2016 (Docket Entry
No. 21).

**PROCEEDINGS**

On October 10, 2014, Plaintiff filed a Complaint seeking review of the denial of his application for Supplemental Security Income. (Docket Entry No. 3).  On February 17, 2015, Defendant filed an Answer along with the Administrative Record ("AR").  (Docket Entry Nos. 10-11).  The parties filed a Joint Position Paper ("Joint Stip.") on May 7, 2015, setting forth their respective positions regarding Plaintiff's claims. (Docket Entry No. 12).

The Court issued a Report and Recommendation on November 13, 2015. (Docket Entry No. 15).

Defendant filed Objections to the Report and Recommendation ("Objections") on December 3, 2015.  (Docket Entry No. 16).

The Court issued an Amended Report and Recommendation on January 14, 2016 (Docket Entry No. 17).

Defendant filed Objections to the Amended Report and Recommendation ("Objections") on February 3, 2016.  (Docket Entry No. 18).

The Court issued an Amended Report and Recommendation on March 15, 2016 (Docket Entry No. 20).

2

This Final Report and Recommendation now issues.

The Court has taken this matter under submission without oral argument. <u>See</u> C.D. Cal. L.R. 7-15; "Order Re: Procedures in Social Security Case," filed October 14, 2014 (Docket Entry No. 6).

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On June 23, 2011, Plaintiff filed an application for Supplemental Security Income, alleging a disability since January 1, 1997. (<u>See</u> AR 135-44). On January 14, 2013, the Administrative Law Judge ("ALJ"), David G. Marcus, heard testimony from Plaintiff and Vocational Expert ("VE") Freeman Leeth, Jr. (<u>See</u> AR 31-71). On April 8, 2013, the ALJ issued a decision denying Plaintiff's application. (<u>See</u> AR 17-23). After determining that Plaintiff had a severe impairment -- major depressive disorder recurrent --[2] and did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment (AR 19), the ALJ found that Plaintiff had the residual functional capacity ("RFC")[3] to perform a full range of exertional levels with the following nonexertional limitations: jobs involving no more than simple routine tasks, and no more than occasional interaction with the public, coworkers and supervisors. (AR 19-20). After finding that Plaintiff had no past relevant work (AR 22), the ALJ found that jobs existed in significant numbers in the national economy

---

[2]    The ALJ found Plaintiff's other impairments (physical problems related to a dog bite; and hyptertension) to be non-severe.  (AR 19).

[3]    A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations.  <u>See</u> 20 C.F.R. § 404.1545(a)(1).

that Plaintiff could perform, and therefore found that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 22-23).

Plaintiff requested that the Appeals Council review the ALJ's decision. (AR 12-13). The request was denied on July 19, 2013. (AR 8-10). The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision. See 42 U.S.C. §§ 405(g), 1383(c).

**PLAINTIFF'S CONTENTIONS**

Plaintiff alleges that the ALJ erred in failing to properly: (1) consider Plaintiff's mental impairments in determining that Plaintiff only suffered from recurrent depression and was not credible, and by failing to take into account Plaintiff's difficulties in concentration, persistence or pace in determining Plaintiff's RFC; and (2) rely on the vocational expert's testimony. (See Joint Stip. at 2-9, 18-21, 23-25).

**DISCUSSION**

After consideration of the record as a whole, the Court finds that Plaintiff's claim that the ALJ erred in determining that Plaintiff suffered only from recurrent depression and that Plaintiff was not fully credible has no merit. However, Plaintiff's claim that the ALJ erred in failing to take Plaintiff's difficulties with concentration, persistence, or pace into account in determining that Plaintiff had the RFC to perform jobs involving simple routine tasks has merit and warrants a remand for further consideration. Since the Court is

remanding on this claim of error, the Court will not address Plaintiff's claim that the ALJ erred in failing to properly rely on the VE's testimony.[4]

**A.   The ALJ Properly Determined that Plaintiff Suffered Only from Recurrent Depression**

Plaintiff asserts that the ALJ erred in failing to determine a more restrictive RFC because Plaintiff "suffers from a lot more than recurrent depression, as supported in the records." In support of this claim, Plaintiff relies on his earlier diagnosis of schizophrenia, a recent diagnosis of bipolar disorder, and Plaintiff's testimony.[5] (See Joint Stip. at 3-4). However, Plaintiff has failed to cite to anything in the record showing that he suffered from a mental impairment other than recurrent depression, and Plaintiff has also failed to allege or show that the existence of a mental impairment other than recurrent depression (i.e., schizophrenia, bipolar disorder) would have affected

---

[4]   The Court declines to consider new arguments raised by Plaintiff in his Reply (i.e., the ALJ improperly rejected the treating physician's assessment of Plaintiff's depression based on a lack of objective evidence; the ALJ improperly rejected the treating psychiatrist's statements based on the lack of substantial documentation; the ALJ failed to evaluate Plaintiff's mental impairment in accordance with the special technique described in 20 C.F.R. § 416.920a(c); the ALJ erred in giving more weight to the opinions and findings of the consultative examiner and the State Agency doctor than to the treating doctor, see Joint Stip. at 18-20). See Bowhay v. Colvin, 2013 WL 819794, *9 (C.D. Cal. March 5, 2013)("The Court need not address arguments first raised in a reply.")(citing In re Rains, 428 F.3d 893, 902 (9th Cir. 2005); Lambert v. Colvin, 2013 WL 1163798, *9 (C.D. Cal. March 20, 2013)("[P]laintiff raised this claim for the first time in her Reply, which is not the proper pleading to raise additional grounds for relief").

[5]   Plaintiff's testimony, and the ALJ's finding with respect to the credibility of Plaintiff's testimony, will be discussed in the next section.

the ALJ's determination about Plaintiff's RFC. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999)("The burden of proof is on the claimant as to steps one to four.").

Contrary to Plaintiff's claim, the medical record does not include any records concerning an earlier diagnosis of schizophrenia. While there are medical records reflecting that Plaintiff was diagnosed with bipolar disorder[6], there is no indication in any of those records that bipolar affective disorder severely limited Plaintiff's functional capacity. Indeed, the majority of the identified medical records indicated stability with Plaintiff's bipolar disorder. (See AR 264, 571, 580, 693, 696-97, 771).

Thus, the ALJ did not err in finding that Plaintiff had only a severe mental impairment of recurrent major depressive order.

**B.   The ALJ Properly Found that Plaintiff was Not Fully Credible**

Plaintiff asserts that the ALJ improperly found that Plaintiff was not fully credible. (See Joint Stip. at 4-8). Defendant asserts that

---

[6]    See AR 518 [California Department of Corrections General Medicine Chronic Care Intake Evaluation dated March 27, 2009, diagnosing Plaintiff with bipolar disorder]; 410 [Los Angeles County/USC Medical Center Initial Psychiatric Evaluation form dated June 21, 2010, noting that Plaintiff had been diagnosed with bipolar disorder], 264 [Kedren Community Mental Health Center ("Kedren CMHC") Discharge Summary dated June 29, 2010, diagnosing Plaintiff with "Bipolar Disorder, with psychotic features, most recent episode manic, improved"], 571, 580, 693, 696-97, 771 [California Hospital Medical Center ("California HMC") records dated April 24, 26, 27 and 29, 2012, diagnosing Plaintiff with bipolar disorder] and 833 [County of Los Angeles/USC Discharge Packet-Discharge Summary dated February 20, 2013, diagnosing Plaintiff with Bipolar affective disorder, unspecified].

the ALJ properly found that Plaintiff was not fully credible.  (See Joint Stip. at 15-18; see also Joint Stip. at 11-14).

Plaintiff made the following statements in an undated Disability Report - Adult:

> (1) his ability to work is limited by "Bi-polar schizophrenic"; (2) he stopped working on December 31, 1989 because of his conditions; (3) he is taking Risperdal for mood swings and for help with sleeping (prescribed by the parole outpatient clinic); (4) from 1999 to June 2010, he obtained treatment (medications) for "Bi-polar schizophrenia" at Kedren Community Mental Health; and (5) from January 21, 2010 to July 29, 2011 (his next scheduled visit), he obtained treatment (medications) for "Bi-polar schizophrenic" at a parole outpatient clinic.

(See AR 156-62).

Plaintiff made the following statements in a Function Report-Adult dated July 15, 2011:

> (1) he lives with family members in a house;(2) with respect to daily activities, he wakes up, prays for God to help him, washes his face, brushes his teeth, eats cold cereal, attends an outpatient substance abuse program from 8 a.m. to noon, goes to Narcotics Anonymous meetings, and stays home to watch movies or television (and eats or snacks in between in these times), takes medication at 8:30 p.m., and goes to sleep by 11

p.m.; (3) prior to his condition, he was "able to think more clearly without racing thoughts while doing tasks;" (4) it is hard to fall asleep because he feels scared and paranoid that people want to harm him; (5) he has no problem with his personal care, but he needs help or reminders to take medicine; (6) he prepares his own meals (top ramen, sandwiches, microwave frozen dinner, some breakfasts and dinners) daily, and spends from 15 to 40 minutes to do so; (7) he does household chores -- washing dishes, laundry, keeping his area clean, taking out trash, gardening (every two weeks), everything (besides the dishes and trash) takes an hour or more, and he sometimes needs help with the gardening; (8) he goes out daily (walking, riding a bicycle or using people transportation), he can go out alone and he does not drive; (9) he shops for food, hygiene products, household products and clothes in stores, 3 to 6 times a month; (10) he is able to pay bills, count change, handle a savings account, and use a checkbook/money orders (his ability to handle money has not changed since his condition began); (11) his hobbies/interests are writing poems and songs and playing congas, he does not write much and he plays congas with friends occasionally, since his condition began, his mind races more and he does not play congas as quickly; (12) he spends time with others (especially his sick father) every day; (13) he regularly goes to church, Narcotics Anonymous meetings, substance abuse treatment class, and a mental outpatient mental health clinic (he needs to be reminded to go places); (14) he does not have any problems getting along with family members, neighbors, or

others; (15) since his condition began, he does not socialize
as much, he is in and out of jail, he cannot keep a job; (16)
his condition affects his memory, completing tasks,
concentration, understanding, following instructions, and
getting along with others, his mood swings and indecisiveness
prevent him from thinking normally and staying focused and he
gets irritated being around too many people (he therefore
keeps to himself); (17) he can walk one or two miles before
needing to rest; (18) he does not know for how long he can pay
attention; (19) he does not finish what he starts; (20) he
does not follow written instructions and follows spoken
instructions better than written instructions; (21) he does
not get along well with authority figures, but he has never
been fired or laid off because of problems getting along with
other people; (22) he does not mind changes in routine; (23)
his unusual fears are being murdered; and (24) he uses
prescribed glasses.

(See AR 191-98).


Plaintiff reported that, since the date of his last report (October
13, 2011), he is more forgetful, needs more reminders, and keeps to
himself more in a Disability Report - Appeal submitted via the Internet
on November or December 9, 2011. (See AR 201-07).


At the hearing, Plaintiff testified as follows:

He has not worked in a long time because of several incarcerations. He did maintenance work at the last facility (Corcoran Substance Abuse Treatment Facility), and did custodian work in prisons. In March 2012 he was bitten by a dog, and in April 2012 he was hit by a car. He is going to be discharged from parole in June 2013. He went to college, and had considered a career as a professional athlete. He worked as a custodian at Goodwill for a couple of years, around the time his son was born (1983). (See AR 35-36, 38, 41-42, 56).

While in prison, he did some legal work for other inmates (he did not have any education in criminal justice, but learned some things at the library) -- he had helped some inmates got out of life sentences, and he had helped inmates prepare 602s and other documents. (See AR 58-59).

He would have a hard time doing maintenance work because it is difficult for him to stand up: one leg cracks (he has to keep it elevated to avoid swelling) and he has septic arthritis in both legs (diagnosed in March 2012). He can stand for approximately 35 minutes before he has to sit down, and then he has to sit for approximately 30 to 40 minutes. He can walk for one or two miles before he has to sit down. He is going to have an MRI for the bursitis in his leg. (See AR 37, 43-44, 52-54).

He cannot lift over 30 pounds with his right arm. (See AR 54).

He has received medical care at Kedren [Community Mental Health Center] for four to five years.  He picks up his psychiatric medications there.  He first went there around 1995 or 1997, and then in 2000 or 2001 (when he suffered a breakdown).  At some point he was in the prison mental health ward.  (See AR 38-39, 42, 62).

He has bipolar disorder.  (At some unknown time he was told he had schizophrenia.)  His symptoms include racing thoughts and mood swings (irritation or depression).  His mood swings are triggered by things like people arguing.  His bipolar episodes make him lash out and cuss at people, and have resulted in his ending up in jail a few times.  His last bipolar episode, which was caused by his brother's "constructive criticism," occurred three weeks ago (and resulted in his being taken to Olive View and then Penn Mar). (See AR 44-47).

To avoid mood swings, he plays instruments (drums and guitar) and stays around the house.  To avoid bipolar episodes, he walks away from arguments.  (See AR 45-47).

He takes his psychiatric medication every day. When Dr. Blakely initially prescribed Risperdal, he used to get bad headaches.  After Penn Mar determined he was on the wrong dosage, the dosage was lowered.  Risperidal helps him sleep at night, and he no longer "get[s] up with racing thoughts and all wondering around." (See AR 38, 40, 44-45).

11

He used to abuse substances, including alcohol and PCP.
Six months at the Amity program helped him. (See AR 40-42).

He forgets "a lot of stuff." His father reminds him of
his appointments. He does not have any other difficulties
with his memory. He sometimes has difficulty understanding
things (for example, the meanings of words used by his
counselor), especially when people talk too fast. He has
difficulty concentrating and/or finishing tasks he starts (for
example, doing things his grandmother or father asked him to
do). He does not like being around other people because of
his "thought reactions." However, he does like being around
certain people, such as people who are intelligent or who talk
to him about music. Besides physical confrontations with
people when he was on drugs, he has not had any physical
confrontations with anybody for at least three or four years.
He does not handle changes in his routine well (he gets upset
when somebody wants to change something for him), unless if it
is for "the right thing." (See AR 47-52)

He goes to "substance class" every day. He has been
clean for three to five months. He likes to write, play
music, or just hang out at home. He also helps take care of
his father (who has cancer). (See AR 35-36, 56).

He recently obtained a safe serve certificate as a cook
trainee. Although he has experience working as a cook's
helper in prison and with family members, he does not like

being around a lot of people and is concerned he might say the wrong thing (he no longer is tolerant and patient) or "wig out."     (<u>See</u> AR 55-56).

When asked if he has mental problems that keep him from working, he responded, "I'm more fearful of me flipping out." If he were to "wig out," he might cuss somebody out or say the wrong thing, and thereby cause some kind of altercation (which would be particularly troublesome if knives were nearby).  He also is unable to work because he cannot lift or stand for very long.  (<u>See</u> AR 56-58).

After briefly summarizing Plaintiff's statements and testimony (<u>see</u> AR 30-31), the ALJ wrote:

After careful consideration of the evidence, the undersigned finds that the claimant's severe impairments can reasonably be expected to cause some significant functional limitations.  However, the extent of his alleged symptoms and functional restrictions are not entirely credible.  Thus, for the reasons discussed below, the Administrative Law Judge finds that the record does not support the imposition of work restrictions beyond those set forth in the above residual functional capacity.

The claimant has a history of criminal convictions and incarcerations (Exhibits B5F/2; B17F/15), and a history of bizarre behavior when either under the influence of drugs

(Exhibits B1F/21, 50; B7F/4) or when not compliant with medication (Exhibit B16F/5). Specifically, the claimant acknowledged abusing substances (i.e., alcohol, PCP, marijuana, and cocaine) in June 2010, when he was placed on a 5150 hold and assessed with low GAF scores of 20-25 (Exhibits B1F/17-18); B8F/41). Thereafter, in June 2011, Parole Outpatient Clinic records indicate that the claimant was experiencing paranoid thoughts and hallucinations after having been out of his medication "for some time" (Exhibit B17F/9). In February 2012, the claimant was placed on another 5150 hold, after being described as agitated and threatening family members; however, he was also "no-compliant" with his medications and "using street drugs" at the time (Exhibits B7F/4; B16F/5). The third-party statement of his aunt further indicates that the claimant acts out when he is not taking his medication (Exhibit B3E).

However, the record demonstrates that when the claimant abstains from polysubstance abuse and takes his prescribed medication, his behavior stabilizes (Exhibits B2F/22-23; 17F/5). For example, the claimant was described as going on a job search in April 2011 (Exhibit B11E/5). In June 2011, the claimant informed his psychiatrist that his medication (i.e., Risperidone) was helpful in calming his racing thoughts and allowing him to sleep well at night (Exhibit B17F/8). Records from May and June 2012 reflect that when taking Risperidone, the claimant was assigned a GAF score of 70. In addition, he denied problems with hallucinations, depression,

mania, anxiety, anger, or irritability. Rather, he endorsed having a "pretty good" mood and [    ] (Exhibit B17F/15, 17).

Similarly, during the hearing, the claimant affirmed he has been clean and sober for several months and reported that his medications have helped him. At the time of his hearing, the claimant was attending a course as a culinary services cook-trainee (Hearing Testimony). His self-reported activities of daily living also suggest a capacity to sustain some level of continued work when he is sober and medication compliant. For instance, the claimant is able to prepare his own meals and engage in household chores (e.g., washing dishes, doing the laundry, cleaning, gardening, taking out the trash, shopping, and managing money) (Exhibit B5E).

During the consultative examination in August 2011, the claimant reportedly was attending an AA program and denied using drug[s] or alcohol (Exhibit B5F/2-3). He stated that he spends his time cooking, cleaning, and playing musical instruments. He further indicated that he has good relationships with his family and a friend (Exhibit B5F/3). Mental status examination was unremarkable with the exception of dysphoric mood and constricted affect. Notably, the claimant had linear and goal-directed thought processes, the ability to perform serial sevens, and exhibited intact judgment and insight (Exhibit B5F/3-4). The consultative examiner assessed him with a GAF score of 61, consistent with some mild symptoms or difficulties (Exhibit B5F/4).

After considering all of the evidence of record, the Administrative Law Judge has decided to accord significant weight to the consultative psychiatric examiner's opinion (Exhibit B5F).  The consultative examiner's assessment of "moderate" limitation in the inability [sic] to understand and carry out complex instructions and "mild-to-moderate" social impairment are consistent with the objective evidence, and provide a basis for the residual functional capacity.  As such, in evaluating claimant's mental impairment under the special technique set forth in 20 CFR 416.920, the undersigned finds that it has caused the following limitations: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and one to episodes of deterioration or decompensation.  The undersigned has translated these broad areas of mental limitations into the function-by-function specific work restrictions in the above residual functional capacity.

The Administrative Law Judge notes that there is no treating physician opinion of record suggesting a mental disability meeting the durational requirement absent a spike caused by noncompliance or by drug use.  Accordingly, the undersigned finds that the residual functional capacity is justified by the evidence as a whole, and reflects thorough consideration of all of the evidence of record, including the

claimant's subjective allegations and the third-party function statement.

(AR 20-22).

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her pain and symptoms only by articulating specific, clear and convincing reasons for doing so. Brown-Hunter v. Colvin, 798 F.3d 749, 755 (9th Cir. 2015)(citing Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)); see also Smolen v. Chater, supra; Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

The ALJ properly discredited Plaintiff's testimony because Plaintiff's behavior was stable when he was not taking drugs and was taking his prescribed medication. See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1008 (9th Cir. 2006)("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits."). As the ALJ noted, the record reflects that: (a) on January 28, 2010, Plaintiff reported that he was off his medications and intoxicated when he

committed petty theft with a prior, and that "he was off medication when he was picked up for his last offense and abusing ETOH to manage his mood swings (see AR 342; see also AR 816 [May 8, 2012 Progress Note]); on June 22, 2010, Plaintiff admitted to abusing drugs (alcohol, PCP, marijuana, and cocaine) when he was placed on an involuntary hold pursuant to California Welfare & Institutions Code § 5150 and was assessed Global Assessment of Functioning ("GAF") scores of 20 and 25 (see AR 250-59, 435 [June 21, 2010])[7]; (b) on June 13, 2011, it was noted that Plaintiff "continues to have paranoid thoughts, hallucinations, ideas that agents and others are after him" and "reports that he has been out of his medication (Risperidone) for some time" (see AR 810); (c) on February 14, 2012, Plaintiff was placed on another 5150 hold because he was agitated and threatening family members, and it was noted that Plaintiff was non-compliant with his medications and had been using street drugs (see AR 391, 800); and (d) Plaintiff's aunt stated in a

---

[7]    A GAF score of 11-20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute). See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"), 34 (2000).

    A GAF score of 21-30 indicates "[b]ehavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preocccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends). See id.

    "[T]he [GAF] score is used for treatment purposes and not for rating a person's ability to work." Deck v. Colvin, 2014 WL 7388792, *1 (9th Cir.).

Function Report - Adult  - Third Party that Plaintiff acts out when he does not take his medication (see AR 165).

The ALJ also noted the following: (a) on April 12, 2011, Plaintiff was reported to be participating in a residential treatment program (Amity Foundation) and to be going on a job search the following week (see AR 236); (b) on June 3, 2011 (while Plaintiff was still in the Amity Foundation program), Plaintiff reported that "[m]edication has been quite helpful for calming his racing thoughts and allowing him to sleep well solidly at night" (see AR 809); (c) on May 8, 2012, Plaintiff denied symptoms of depression, mania and anxiety, denied anger and irritability, stated that his mood is "pretty good" and that he is doing better with 1 mg (rather than 3 or 4 mg) of Risperidone, and was assessed a GAF score of 70 (see AR 816);[8] (d) on June 12, 2012, Plaintiff denied hallucinations, delusions, suicidal ideation and homicidal ideation, stated that he slept pretty well, and was assessed a GAF score of 70; and (e) Plaintiff testified at the hearing that Risperidal helps him sleep at night, and that he no longer "get[s] up with racing thoughts and all wondering around" (see AR 40).

In addition, the ALJ's finding that Plaintiff's abilities to perform certain daily activities, such as preparation of meals, washing dishes, laundry, cleaning, gardening, taking out the trash, shopping and managing money) undermined his credibility concerning his functional

---

[8]    A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships.  See Diagnostic and Statistical Manual of Mental Disorders, supra, at fn. 5.

limitations because "his self-reported activities of daily living also suggest a capacity to sustain at some level of continued work when he is sober and medication compliant" (AR 21), was a clear and convincing reason for partially discrediting Plaintiff's testimony. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1999). See also Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations."); Reddick v. Chater, supra ("Only if the level of activity were inconsistent with the Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").[9]

The Court rejects Plaintiff's claim that the ALJ improperly gave significant weight to the opinion of the consultative examiner. The ALJ properly found that the opinion of Dr. Fahmy Ibrahim, a psychiatrist,

---

[9]    Even if the ALJ erred in discrediting Plaintiff's testimony based on his ability to perform daily activities, see Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)("[T]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled."), the Court finds any such error to be harmless since, as discussed above, the ALJ provided other clear and convincing reasons for partially rejecting Plaintiff's testimony about his symptoms and limitations. See Carmickle v. Commissioner, 533 F.3d 1155, 1162-63 (9th Cir. 2008)("So long as there remains 'substantial evidence supporting the ALJ's conclusion on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion,' such is deemed harmless and does not warrant reversal.")(citation omitted); Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (an ALJ's error is harmless "when it is clear from the record . . . that it was 'inconsequential to the ultimate nondisability determination.'").

1  was consistent with the objective evidence in the record and based on
2  Dr. Ibrahim's independent examination of Plaintiff.  See Tonapetyan v.
3  Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); 20 C.F.R. § 416.927(c)(4)
4  ("Generally, the more consistent an opinion is with the record as a
5  whole, the more weight we will give to that opinion.").

6

7      Following a complete psychiatric examination, Dr. Ibrahim found
8  that Plaintiff had the following functional limitations:  mildly-to-
9  moderately limited in his ability to relate to and interact with co-
10 workers, colleagues and supervisors; mildly-to-moderately limited in his
11 ability to understand and carry out simple instructions; mildly limited
12 in his ability to maintain focus and concentration required to do work-
13 related activities; moderately limited in his ability to understand and
14 carry out complex or detailed instructions; and mildly-to-moderately
15 limited in his ability to cope with workplace stress.  (See AR 377).
16 Dr. Ibrahim's findings (at a time when Plaintiff denied smoking,
17 alcohol, or illicit drug use, see AR 376) included, inter alia, that
18 Plaintiff was able to maintain eye contact, was well groomed and had
19 good hygiene; Plaintiff's psychomotor activity was within normal limits;
20 Plaintiff's speech was fluent and regular; Plaintiff's mood was
21 dysphoric; Plaintiff's affect was constricted; Plaintiff's thought
22 processes were linear and goal-directed, and did not have loosening of
23 associations, flight of ideas, racing thoughts, thought blocking,
24 thought insertions, thought withdrawal or thought broadcasting;
25 Plaintiff did not have auditory or visual hallucinations, delusions,
26 illusions, ruminations, obsessions, compulsions, paranoia, or suicidal
27 or homicidal ideation; Plaintiff was not deficient in cognitive,
28 orientation and memory; Plaintiff was not deficient in concentration

("serial sevens", spelling backwards); Plaintiff was not deficient in abstract thinking; Plaintiff was not deficient in his fund of knowledge; and Plaintiff had intact insight and judgment. (See AR 376-77). Dr. Ibrahim assessed Plaintiff with a GAF score of 61. (See AR 377). Based on Dr. Ibrahim's findings, the ALJ properly found, in determining Plaintiff's RFC, that Plaintiff was limited to jobs involving no more than occasional interaction with the public, coworkers and supervisors. (AR 19-20).

Moreover, none of Plaintiff's treating physicians provided opinions about Plaintiff's functional limitations.

The Court also rejects Plaintiff's claim that the ALJ erred in failing to consider whether Plaintiff can maintain employment for a significant period of time (see Joint Stip. at 8, citing Gatliff v. Commissioner of Social Sec. Admin., 172 F.3d 690, 692 (9th Cir. 1999) ("We are persuaded by the reasoning of our sister circuits that substantial gainful activity means more than merely the ability to find a job and physically perform it; it also requires the ability to hold the job for a significant period of time.") and Singletary v. Bowen, 798 F.2d 818, 822-23 (5th Cir. 1986)). Plaintiff has failed to cite to any evidence in the record that he would not be able to maintain employment for a significant period of time. See Gatliff v. Commissioner of Social Sec. Admin., supra, 172 F.3d at 691 (noting that "During the 15 years prior to his claimed disability, [the claimant] was employed sporadically and held 20-30 jobs. He was terminated from at least half of those jobs, the longest of which lasted six to eight months, due to anger problems and conflicts with supervisors or co-workers" and that "a

vocational expert conceded that [the claimant] could only be expected to stay in any one job for a 'couple of months' before being fired as a result of his mental impairments"). Plaintiff apparently did not have many past jobs because of his incarcerations, and there is no indication that Plaintiff was fired from the jobs he claims to have had during the 15 years prior to the onset date of his alleged disability (i.e., a custodian at Goodwill from 1982 to 1983, a security guard in 1995, and a telemarketer from February 1989 to February 1999, see AR 175) because of his mental impairment. Moreover, Plaintiff testified that he did maintenance work, custodial work, and legal work in prisons (see AR 35, 56, 58-59), but did not testify he was fired from any of those positions.

Therefore, the ALJ did not err in finding that Plaintiff could maintain employment for a significant period of time.

**C.    The ALJ Erred In Failing To Consider The Effect Of Plaintiff's Difficulties In Concentration, Persistence And Pace in Determining That Plaintiff Could Perform Jobs Involving Simple Routine Tasks**

Plaintiff claims that the ALJ failed to take into account Plaintiff's difficulties in concentration, persistence or pace in determining that Plaintiff had the RFC to perform simple, repetitive work (See Joint Stip. at 9). Defendant asserts that the ALJ's determination about Plaintiff's RFC adequately accounted for Plaintiff's mental limitations. (See Joint Stip. at 14).[10]

---

[10]    Defendant contends that a finding about a claimant's limitations in concentration, persistence or pace is not a RFC determination, but rather is related to the determination about whether
(continued...)

The ALJ determined that Plaintiff had "mild deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner." (AR 21). The basis of that determination is not totally clear but appears to have been based on Dr. Ibrahim's opinion that Plaintiff was mildly-to-moderately limited in his ability to understand and carry out simple instructions, mildly limited in his ability to maintain focus and concentration required to do work-related activities, moderately limited in his ability to understand and carry out complex or detailed instructions, and/or mildly-to-moderately limited in his ability to cope with workplace stress (see AR 377). (See AR 21).[11]

Defendant relies on Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) as support for the assertion that the ALJ's determination that Plaintiff could perform jobs involving simple routine tasks adequately captured Plaintiff's moderate mental limitations. (See Joint Stip. at 14; Objections at 3-4). Defendant's contention that in the Report and Recommendation the Court did not accurately distinguish Stubbs-Danielson from the present case (see Objections at 3) is well-taken. Nonetheless, Stubbs-Danielson is distinguishable.

---

[10]   (...continued)
a claimant has a severe impairment and/or met any of the listed impairments. (See Objections at 3).   The statutes and case cited by Defendant do not support that contention.   Moreover, Defendant's contention is belied by the fact that the ALJ's finding that Plaintiff had mild limitations in concentration, persistence or pace was contained in the section of the ALJ's decision concerning Plaintiff's RFC (see AR 21).

[11]   As noted above, the ALJ afforded Dr. Ibrahim's opinion significant weight.   The ALJ did not even mention the findings of the non-examining State Agency physician (see AR 76-83).

In <u>Stubbs-Danielson v. Astrue</u>, 539 F.3d at 1174, the Ninth Circuit held that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace when the assessment is consistent with restrictions identified in the medical testimony."  In <u>Stubbs-Danielson</u>, one doctor found that the plaintiff had a "slow pace, both with thinking and her actions," was moderately limited in her ability "to perform at a consistent pace without an unreasonable number and length of rest periods, and was mildly limited in other mental functioning areas, and another doctor found the plaintiff had a "slow pace, both in thinking & actions" and was moderately limited in other mental functional limitations. <u>Id.</u> at 1173. Based on the fact that there was medical testimony -- the second doctor's opinion, that the plaintiff had the ability to perform simple tasks, the Ninth Circuit found that the ALJ did not err in finding that the plaintiff had the RFC to perform simple, routine work. <u>Id.</u> at 1173-75 ("The ALJ translated Stubbs-Danielson's condition, including the pace and mental limitations, into the only concrete restrictions available to him--Dr. Eather's recommended restriction to 'simple tasks.'").  Here, unlike in <u>Stubbs-Danielson</u>, the ALJ's finding that Plaintiff could perform simple, routine tasks was not based on any doctor's opinion.

There is no medical evidence in the record, including a medical source statement, establishing that Plaintiff was capable of simple routine work *despite his mild limitation in concentration, persistence, or pace*.  Therefore, the ALJ erred in failing to consider and include that limitation in determining Plaintiff's ability to engage in simple,

routine work.[12]   See Brink v. Commissioner Social Sec. Admin., 343 Fed.Appx 211, 212 (9th Cir. Aug. 18, 2009)(rejecting Commissioner's contention that the phrase "simple, repetitive work" encompasses difficulties with concentration, persistence or pace); Feltis v. Astrue, 2012 WL 2684994, *4 (E.D. Cal. July 6, 2012)(RFC failed to reflect ALJ's stated acceptance of consultative examiner's findings regarding impact of plaintiff's impairment on pace, endurance and ability to deal with changes in a routine work setting); Lim v. Astrue, 2011 WL 3813100, *7 (E.D. Cal. Aug. 29, 2011)(ALJ failed on incorporate limitation of sustained concentration into RFC); Bentancourt v. Astrue, 2010 WL 4916604, *3 (C.D. Cal. Nov. 27, 2010)(ALJ failed to include the plaintiff's limitations in concentration, persistence and pace in hypothetical question to vocational expert); see also Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 6910 (9th Cir. 2009)("[A]n RFC that fails to take into account a claimant's limitations is defective.").

**D.   Remand Is Warranted**

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  Id. at 1179

---

[12]   Although the State Agency reviewing psychiatrist opined that Plaintiff was moderately limited in his ability to maintain attention and concentration, and perform at a consistent pace, but could perform "simple work" (AR 77-83) the ALJ did not rely on, or even mention, these findings.

("[T]he decision of whether to remand for further proceedings turns upon the likely utility of such proceedings."). However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate. <u>McLeod v. Astrue</u>, 640 F.3d 881, 888 (9th Cir. 2011); <u>Harman v. Apfel</u>, <u>supra</u>, 211 F.3d at 1179-81.

Since the ALJ failed to take his finding that Plaintiff had mild limitations in concentration, pace or persistence into account in determining Plaintiff's RFC, remand is appropriate. Because outstanding issues must be resolved before a determination of disability can be made, and "when the record as a whole creates serious doubt as to whether the [Plaintiff] is, in fact, disabled within the meaning of the Social Security Act," further administrative proceedings would serve a useful purpose and remedy defects. <u>Burrell v. Colvin</u>, 775 F.3d 1133, 1141 (9th Cir. 2014)(citations omitted).[13]

**RECOMMENDATION**

For the reasons discussed above, IT IS RECOMMENDED that the district court issue an Order: (1) accepting and adopting this Second Amended Report and Recommendation; and (2) directing that Judgment be

---

[13]   The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time. "[E]valuation of the record as a whole creates serious doubt that Plaintiff is in fact disabled." See <u>Garrison v. Colvin</u>, 759 F.3d 995, 1021 (2014). Accordingly, the Court declines to rule on Plaintiff's claim regarding the ALJ's improper reliance on vocational expert testimony. Because this matter is being remanded for further consideration, this issue should also be considered on remand.

entered reversing the decision of the Commissioner and, pursuant to Sentence Four of 42 U.S.C. § 405(g), remanding the matter for further administrative action consistent with this Amended Report and Recommendation.

DATED:  April 26, 2016.

_____
/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.